# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2012

## STATE OF TENNESSEE v. BENJAMIN MURRELL

**Appeal from the Criminal Court for Shelby County**
**No. 09-06930      Chris Craft, Judge**

**No. W2011-02672-CCA-R3-CD  - Filed December 18, 2012**

A Shelby County jury convicted appellant, Benjamin Murrell, of criminal attempt to commit voluntary manslaughter and employing a firearm during the commission of a dangerous felony.  The trial court sentenced him to an effective sentence of eighteen years in the Tennessee Department of Correction.  Appellant challenges the sufficiency of the evidence supporting his convictions.  After reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JEFFREY S. BIVINS, JJ., joined.

Stephen C. Bush, District Public Defender; Harry E. Sayle III (on appeal) and Robert Trent Hall (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Benjamin Murrell.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History and Facts

In September 2009, a Shelby County grand jury indicted appellant and the co-defendant, Melvin Jackson, for criminal attempt to commit first degree murder and employing a firearm during the commission of a dangerous felony.  The trial court held a jury

trial that resulted in appellant's acquittal for criminal attempt to commit first degree murder and a hung jury as to the lesser-included offense of criminal attempt to commit voluntary manslaughter.[1]  The trial court declared a mistrial and reset the case for trial.

The court held a retrial August 15-18, 2011, on the charges of criminal attempt to commit voluntary manslaughter and employing a firearm during the commission of a dangerous felony.  The parties presented the following evidence at trial:

Officer Clarence Neal with the Memphis Police Department testified that on June 6, 2009, he responded to a "man down" call at 589 Mississippi Boulevard, in the area of the Foote Homes Housing Project ("Foote Homes").  When he arrived at the scene, he observed the victim, "a male black [who] was in front of a Lincoln Town Car."  The victim was lying on the ground unconscious.  Officer Neal said that the victim's mouth was open, that his eyes were closed, and that he appeared to be dead.  He saw that the victim was bleeding and covered the victim's wounds with a towel "to keep [them] from bleeding out."  He asked the victim who had injured him, but the victim was unresponsive.  Officer Neal called paramedics to the scene, and the paramedics transported the victim to the hospital.

After the paramedics transported the victim to the hospital, Officer Neal searched for witnesses.  After speaking with family members of the victim, he developed a suspect.  He gave the information about the suspect to other officers, and they attempted to find the suspect.

Officer David Payment with the Memphis Police Department's Crime Scene Investigation Unit testified that when he arrived at the scene in this case, he observed "a vehicle parked on the street with spent casings and possible blood around it."  He stated that officers had secured the scene with crime scene tape.  Paramedics had already transported the victim to the hospital when Officer Payment arrived.

Officer Payment identified several photographs of the crime scene, including photographs of the spent casings.  He also identified five spent .380 casings and a spent bullet fragment that he recovered from the scene.  Officer Payment testified that he did not find appellant's fingerprints or DNA at the scene.  He further testified that he did not find a gun at the scene.  He said that a camera outside the store where the shooting took place captured surveillance video; however, officers were unable to download the video.

---

[1] We glean from the record that the co-defendant pleaded guilty in a separate proceeding.  He is not a party to this appeal.

Trena Jenkins testified that the victim, Marques Jenkins, was her son. On June 6, 2009, she went to the birthday party of her nephew, Damon Collier, inside an apartment in Foote Homes. Two of her other sons, Anthony and Tashun[2], were at the party as well. Ms. Jenkins said she knew appellant as "BAM." She further said that she knew appellant because appellant's sister and Mr. Collier had dated for seventeen years. Ms. Jenkins was friendly with appellant and did not have any problems with him before the day of this incident.

Ms. Jenkins stated that the party was going well when appellant arrived. However, at some point during the party, Ms. Jenkins' sister screamed, "Stop BAM!" According to Ms. Jenkins, her sister was "frantic" and "scared like something was fixing to happen." After speaking with her sister, Ms. Jenkins became concerned about what appellant was going to do and the safety of the victim. Ms. Jenkins asked appellant what happened, but he did not reply. Ms. Jenkins said appellant went to his uncle's apartment, and she went to find the victim. The victim arrived at Ms. Jenkins' location, and she asked him what was happening. She said there was "a lot of screaming going on." She further said the victim was trying to talk to her, but he was focused on appellant, who was behind her. Ms. Jenkins stated that she was between the victim and appellant, who were swinging at each other. She attempted to keep the men from fighting.

Ms. Jenkins testified that some teenagers came across the street as she was attempting to keep the victim and appellant from fighting. The teenagers were hollering and saying, "[Y]'all got BAM f[]ed up." The victim's cousins walked toward the teenagers, and a fight started in the street. Ms. Jenkins said that appellant disappeared when the fight started. The victim then went to help his cousins fight the teenagers who had come from across the street. Ms. Jenkins attempted to keep her sons, including the victim, from fighting. According to Ms. Jenkins, the fight lasted approximately forty-five seconds. It ended when appellant drove a vehicle into the crowd, striking three people. Ms. Jenkins asked appellant what he was doing, and appellant said, "I'm sorry," put the vehicle in reverse, and left the scene.

After the fight, people began to leave the party. Ms. Jenkins began looking for her sons. She found her sons, Tashun and Anthony, and continued to look for the victim and another one of her sons, Sam. She sat in her car with Tashun and Anthony seated in the back and waited to see if the victim and Sam returned to the scene. She eventually saw the victim exiting a store with some food. She stated that she "thought everything was done" because the victim sat on the hood of a car that was in front of the store and began eating. The victim was accompanied by his cousin, Damon Collier, and his aunt, Sara Collier. Ms. Jenkins and

---

[2] Ms. Jenkins's sons share the same surname. Thus, we will refer to them by their first names to avoid confusion. In doing so, we intend no disrespect. We will refer to her son Marques Jenkins, the victim in this case, as "the victim."

the victim were "hollering" at each other about continuing the party on Beale Street. Ms. Jenkins continued to sit in her car, talking on her telephone and waiting for Sam to appear. Ms. Jenkins testified that she looked to her left and saw appellant and the co-defendant walking toward the victim. She said, "BAM, don't go down there with that sh[]." Appellant looked at her but did not respond. Ms. Jenkins said appellant and the co-defendant walked in front of the victim. The co-defendant "pulled the gun up and had it directly in front of [the victim]." Appellant grabbed the co-defendant's arm and said, "[M]an, shoot that mother f[]." The co-defendant shot the victim approximately four or five times. Ms. Jenkins stated that appellant and the co-defendant ran across the street toward her car. When they got to her car, she said, "I'm going to get you," to appellant. She said appellant smirked at her, but the co-defendant appeared afraid.

Ms. Jenkins testified that she got out of her car and ran toward the victim. She stopped approximately ten feet away from him because she did not want to see him in his condition. She called 9-1-1 and then "passed out." When Ms. Jenkins regained consciousness, she asked about the location of the victim. The ambulance was driving past her, and bystanders told her he was in the ambulance. Ms. Jenkins entered her vehicle and followed the ambulance to the Regional Medical Center. Initially, she was unsure whether the victim was alive but discovered he was alive approximately an hour later. Two days later, Ms. Jenkins learned that the victim was paralyzed because of the shooting.

Ms. Jenkins was able to identify appellant because she had known him for seventeen years. She had not previously known the co-defendant nor had she seen him before the party. The police showed her photographs of suspects, and she identified appellant and the co-defendant.

Anthony Jenkins, the victim's brother, testified that he knew appellant because his father "used to be around [appellant]." Anthony knew the co-defendant because he went to school with the co-defendant's sister. He did not know whether appellant and the co-defendant were associated with the Crips gang. Anthony was at the birthday party on June 6, 2009, and said that the victim and appellant, along with a crowd of people, were fighting in the middle of the street. Anthony heard appellant and the co-defendant tell the victim that they were going to come back "and get some more people." He said the fighting ended when appellant ran over two people with his vehicle. Anthony stated that the people who were fighting cleared the area and that an ambulance arrived at the scene. He left the scene with his friends.

Anthony further testified that he met with his mother, Ms. Jenkins, and his brother, Tashun, sometime later, and they sat in Ms. Jenkins' vehicle. Anthony stated that while he was in the vehicle, he saw appellant come from behind a house and give the co-defendant a

-4-

gun. According to Anthony, appellant told the co-defendant to shoot the victim, but the co-defendant was shaking and did not want to shoot the victim. He stated that the co-defendant raised the gun toward the victim, that appellant shook the co-defendant's hand two or three times, and that the gun fired, shooting the victim. Anthony heard multiple shots fired. Anthony stated that appellant and the co-defendant ran past him as he exited the car and ran toward the victim.

On cross-examination, Anthony admitted that he did not testify at a prior hearing that appellant said he was returning with more people. He further admitted that at the prior hearing, he did not testify that appellant gave the co-defendant the gun.

Tashun Jenkins, another of the victim's brothers, testified that he attended the birthday party in Foote Homes on June 6, 2009. He stated that his family got into a physical altercation with some people who were across the street from the party. He said appellant got into a vehicle and ran over two or three people who were fighting. Tashun stated that appellant then exited the vehicle. Tashun's cousin attempted to stop the fight, but appellant pulled out a gun and told him that he was going to kill him. Tashun testified that appellant and the victim had argued earlier in the day about a red shirt. He said the victim was wearing a red shirt, and appellant told the victim that he was going to "shoot or kill" him if he did not take off the red shirt.

Tashun stated that he was in his mother's vehicle when the co-defendant shot the victim. He saw appellant and the co-defendant "coming out the cut" between a house and an apartment complex. Tashun said appellant gave the co-defendant a gun and told him to shoot the victim. He stated that the co-defendant had the gun pointed at the victim, and appellant grabbed the co-defendant's hand. The gun fired four or five times when appellant grabbed the co-defendant's hand, and the bullets struck the victim. After the co-defendant shot appellant, he and appellant ran into Foote Homes. Tashun exited the vehicle and ran toward the victim. He stated that the victim was in "critical condition" and was unable to talk.

On cross-examination, Tashun admitted that he did not testify at a prior hearing that he heard appellant say he was going to kill anyone. He only stated that appellant said he was going to shoot.

The victim, Marques Jenkins, identified appellant and stated that he had known him since he was five years old. He stated that his oldest cousin, Damon Collier, was in a relationship with appellant's sister. The victim stated that while growing up, he lived in Foote Homes for some time. He said the Crips gang was present in Foote Homes, and he became a member of the Crips when he was thirteen years old. He stated that appellant was

also a Crip. Appellant was "OG," which meant he was the head of the gang. The victim explained that although he and appellant were both members of the Crips gang, they belonged to different "sets." The victim was a member of the Raymond Crips, and appellant was a member of the Hoover Crips.

The victim recalled attending his cousin's birthday party in Foote Homes. He stated that he went to a house next door to talk to a friend, who was wearing a red shirt. The victim's friend told the victim that appellant had instructed him to take off the red shirt. The victim explained that the red shirt was disrespectful to the Crips because it was the color of the Bloods, a rival gang. The victim's friend removed the shirt. The victim said, "[H]e ain't your daddy, he don't [sic] buy your clothes or nothing [sic], why you [sic] take it off?" His friend shook his head, and the victim took the shirt from him and wore it.

The victim testified that it took some time for appellant to notice that he was wearing the red shirt. When appellant noticed that the victim was wearing the red shirt, "[h]e just came out [of] the blue and start[ed] pointing his finger in [the victim's] face." Appellant told the victim that the victim thought he was "all that" and told the victim that he was going to get a "50 cal." The victim said "50 cal" meant a .50 caliber gun. The victim jumped up, ready to fight, but appellant ran away. Later, appellant reappeared and the victim and his family began arguing with appellant's "little Hoover Crips." The victim said appellant drove his car through the crowd of people who were arguing, attempting to hit the victim. However, the victim said his mother saw appellant coming and "snatched [him] out of the way." Appellant struck the victim's uncle and two other people with his car. The victim said his mother drove him home. He was about to go inside but decided that he did not want to be at home by himself. His mother did not want to leave him there alone, so they returned to the party.

The victim testified that when he and his mother returned to the Foote Homes area, he was going to stay inside of his mother's vehicle, but he was hungry and decided to go into a nearby store to purchase something to eat. The victim recalled talking to his aunt and friend at the store, but he did not remember any events after that conversation. He stated that his next memory after speaking with people in the store was waking up in the hospital. The victim said he was shot four times, but he did not remember who shot him. He further said that he was hospitalized for three months and is paralyzed from the chest down because of the shooting.

The victim testified that his fight with appellant was about his friend's T-shirt. He denied having a "beef" with the co-defendant or appellant before the day of the shooting. He admitted that he had been drinking beer that day but said that he did not smoke anything.

-6-

The victim did not have a gun or threaten anyone with a gun that day. He said that the only threats of gun use came from appellant.

Melvin Jackson, appellant's co-defendant, testified that he shot the victim on June 6, 2009, during an altercation. According to the co-defendant, the victim and the victim's family "jump[ed] on him" as he was leaving a store on Mississippi Boulevard, and he shot the victim. He stated that he got the gun with which he shot the victim from a "junkie." The co-defendant further stated that he was alone when he shot the victim, and no one told him to shoot the victim. After the co-defendant shot the victim, a couple of shots were fired at him. The co-defendant said he ran away and slept in an empty house until his father came to get him.

After his father retrieved him from the empty house, the co-defendant went to his father's house. He stated that he could not go back to his home because the victim "and them [sic] kin folks [or 'little Crip Homies'] was [sic] probably going to come through there." The co-defendant said he did not know to which Crips "set" the victim belonged. The co-defendant was a member of the Hoover Crips. The co-defendant stated that his father called the police, and the police arrested him at his father's house.

The co-defendant testified that he did not know appellant and was not afraid of him. He denied that appellant ordered him to shoot the victim and said, "If he ordered me, we would have been fighting when I stepped through the door. I just signed 15 years of my life away."

The State showed the co-defendant the "Advice of Rights" form that he signed; however, the co-defendant stated he did not remember signing the form because he was under the influence of cocaine and marijuana. The co-defendant reviewed his statement to police and testified that he did not remember making it. When asked about the portion of the statement where he said appellant gave him the gun to use, the co-defendant answered that he "probably" did not make the statement. He said that the only thing he remembered was "getting bound over to the juvenile [court]." The co-defendant did not know whether he wrote, "[T]his is BAM[,] and he told me to shoot the guy," beneath a photograph of appellant. The co-defendant stated that he only recalled telling the police "some story about how [the victim] and his boys jumped on [him] as [he] was leaving the store[.]" He further stated that he was the victim in this incident.

The co-defendant further testified that he did not recall a notarized letter he wrote, which stated that appellant did not have anything to do with the incident and was not around him at the time of the incident. The letter further stated that the co-defendant was not in a gang, that he was an honor student, and that the co-defendant's father made him "say that

-7-

stuff so that they would blame it on [appellant]." The co-defendant admitted that the handwriting in the letter looked like his, but he was unsure whether he wrote the letter.

Sergeant Byron Braxton with the Memphis Police Department's Felony Response Unit testified that he investigated the incident in this case. He stated that a witness identified the co-defendant as the shooter. Sergeant Braxton contacted the co-defendant's mother and advised her that the police wanted to speak with the co-defendant because he was a suspect in a shooting.

The co-defendant, accompanied by his parents, went to the felony response unit six days after the shooting to speak with Sergeant Braxton. The co-defendant told Sergeant Braxton that he encountered appellant the day of the incident and that appellant told him that he wanted to shoot the victim. The co-defendant told appellant that he "didn't have any beef" with the victim and that appellant and the victim needed to "squash that." The co-defendant began to walk away when he felt something cold on the back of his neck. The co-defendant realized it was a gun. Appellant told the co-defendant that he would "blow [the co-defendant's] mother-f[] brains out the back of [his] head" if he did not shoot the victim. Appellant advised the co-defendant that he "better not try to run or move." The co-defendant stated that he cooperated with appellant because he was afraid. Appellant put the gun in the co-defendant's hand and pushed him toward the victim. The co-defendant further told Sergeant Braxton that when he saw the victim, he closed his eyes and began shooting at the victim. The co-defendant stated to Sergeant Braxton that he attempted to aim low so the victim would fall. Appellant took the gun away from the co-defendant, and the men ran in separate directions. Sergeant Braxton reduced the co-defendant's statement to writing. The State entered the statement as an exhibit at trial.

Sergeant Braxton further testified that in his statement, the co-defendant admitted he was a Hoover Crip. The co-defendant said that the victim was unarmed and that no one shot at the co-defendant during the incident. When Sergeant Braxton asked the co-defendant if he wanted to add anything to his statement, the co-defendant said, "I wish I could have taken the chance for [appellant] to kill me." Sergeant Braxton stated that he showed the co-defendant appellant's booking photograph, and the co-defendant identified appellant as "BAM," the person who instructed him to shoot the victim.

After hearing the evidence and deliberating, the jury found appellant guilty of criminal attempt to commit voluntary manslaughter and of employing a firearm during the commission of a dangerous felony. The trial court sentenced appellant to eight years for criminal attempt to commit voluntary manslaughter and a consecutive ten-year sentence for employing a firearm during the commission of a dangerous felony, for a total effective sentence of eighteen years in the Tennessee Department of Correction.

## II. Analysis

In a one-sentence statement, without any argument or citation to authorities[3], appellant contends that the "the proof in the present case is not sufficient to support the jury's verdict and should be set aside." The State responds that when viewed in the light most favorable to the State, the evidence was sufficient to convict appellant. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must

---

[3] *See* Tenn. R. App. P. 27 ("The brief of the appellant shall contain . . . an argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]")

demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

A defendant commits criminal attempt to commit a crime when he or she

acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2006).

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id*. § 39-13-211(a) (2006). "It is an offense to employ a firearm during the . . . [a]ttempt to commit a dangerous felony[.]" Tenn. Code Ann. § 39-17-1324 (b)(2) (2006). Tennessee Code Annotated section 39-17-1324(i)(1)(C) lists voluntary manslaughter as a dangerous felony.

Viewed in the light most favorable to the State, the evidence shows that appellant was upset with the victim because the victim had disrespected his gang by wearing a red shirt. Appellant and the victim became involved in an altercation, and appellant threatened to shoot the victim. Appellant, who was twenty-nine years old, gave the sixteen-year-old co-defendant a gun and ordered him, at gunpoint, to shoot the victim. Appellant told the co-defendant that he would shoot him if he did not shoot the victim. The co-defendant walked to where the victim was sitting and eating but was apprehensive about shooting him. Appellant grabbed the co-defendant's hand and said, "Shoot the motherf[]." The gun fired, shooting the unarmed victim multiple times. Several eyewitnesses consistently testified to

these facts.[4]  In his statement[5] to police, the co-defendant stated that appellant held a gun to his neck and demanded that he shoot the unarmed victim.

From this evidence, a rational juror could have found that appellant intended to kill the victim.  Appellant employed a firearm while forcing the co-defendant to shoot the victim. He also gave the co-defendant a gun with which to shoot the victim and ordered the co-defendant to shoot the victim because appellant was angry at the victim for disrespecting his gang by wearing a red shirt.  Accordingly, we conclude that the evidence was sufficient to support appellant's convictions.  Appellant is not entitled to relief.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE

---

[4] The trial court instructed the jury on criminal responsibility for the conduct of another.  *See State v. Ameale Hudson*, No. W2010-02625-CCA-R3-CD, 2012 WL 4044841, at *9 (Tenn. Crim. App. Sept. 14, 2012) (holding that the evidence was sufficient to convict appellant for first degree felony murder and especially aggravated robbery under a theory of criminal responsibility when appellant gave his co-defendant a gun with which to rob the victim, tried to clear the area of witnesses prior to the offense, watched the victim, and communicated with his co-defendant via hand signals.)

[5] During the trial, the co-defendant was uncooperative.  He testified that he did not know appellant and that he had never seen him before.  However, his statement given six days after the offense indicated that appellant put a gun to the co-defendant's neck and ordered co-defendant to shoot the victim or face death. The trial court properly admitted the co-defendant's statement as substantive evidence.  *See* Tenn. R. Evid. 803 (26).